FILED

2007 May-09  PM 12:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

BRIAN LACY,                          )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        Case No. 7:05-cv-2154-TMP
                                     )
CLIFF HEARD,                         )
                                     )
            Defendant.               )

MEMORANDUM OPINION

This case is before the court on the defendant's renewed motions for judgment as a matter of law pursuant to Rule 50(b) of the *Federal Rules of Civil Procedure*. Defendant made his Rule 50(a) initially at the close of the plaintiff's case-in-chief at trial, and again at the close of the defense case. On both occasions, the court reserved ruling on the plaintiff's Fourth Amendment excessive force claim against Officer Heard in both his individual and official capacities, and on the plaintiff's Alabama claim for assault and battery.[1] In support of his renewed motion for judgment as a matter of law, defendant makes three argument:

(1) With respect to plaintiff's Fourth Amendment claim against him in his personal capacity, he is entitled to qualified immunity;

---

[1] When the Rule 50 motions were made at the close of the plaintiff's case, the court granted them with respect to certain claims by plaintiff, but reserved ruling on these theories. Dismissed on defendants' Rule 50 motions at that time were plaintiff's Fourth Amendment constitutional claim for arrest without probable cause and his Alabama state-law claims sounding in false arrest and false imprisonment. The court ruled at that time that the plaintiff's arrest was legal and constitutional, but reserved ruling on whether the degree of force used to effect the arrest was excessive. The jury later returned a verdict in favor of defendant Byram Hammands on all claims, but was unable to reach a verdict on the claims against defendant Heard.

(2)  With respect to the Fourth Amendment claim against him in his official capacity, the plaintiff's evidence at trial was insufficient to establish excessive force under the circumstances; and

(3)  With respect to the Alabama state-law claim of assault and battery, he is entitled to discretionary-function immunity.

The motions have been briefed by all parties.  For the reasons explained below, the court finds that the renewed motion is due to be granted and all of plaintiff's remaining claims dismissed with prejudice.

### Rule 50 Standard for Judgment as a Matter of Law

Rule 50(b) of the *Federal Rules of Civil Procedure* provides as follows:

> If the court does not grant a motion for judgment as a matter of law made under subdivision (a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after the entry of judgment or (if the motion addresses a jury issue not decided by a verdict) no later than 10 days after the jury was discharged. The movant may alternatively request a new trial or join a motion for a new trial under Rule 59.

> In ruling on a renewed motion, the court may:
> (1) if a verdict was returned:
>   (A) allow the judgment to stand,
>   (B) order a new trial, or
>   (C) direct entry of judgment as a matter of law; or
> (2) if no verdict was returned:
>   (A) order a new trial, or
>   (B) direct entry of judgment as a matter of law.

Because the jury did not return a verdict with respect to the claims alleged against Officer Heard, individually or in his official capacity, only the provisions of Rule 50(b)(2) are pertinent.  Thus, on

2

Officer Heard's renewed motion for judgment as a matter of law, the court may either order a new trial or direct entry of judgment as a matter of law.  In making the assessment whether to direct entry of judgment as a matter of law, the court must view the evidence most favorably to the non-moving plaintiff in the same manner as would occur on a pretrial motion for summary judgment.  Indeed, the courts repeatedly emphasize that the standard to be used in addressing a motion for summary judgment is the same as that for analyzing a Rule 50(a) motion for judgment as a matter of law; that is, whether, on the evidence presented,  a reasonable jury would have a legally sufficient basis for returning a verdict for the non-moving plaintiff.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986); Bennett v. Parker, 898 F.2d 1530, 1532 (11th Cir. 1990).  The court must view the evidence in the light most favorable to the plaintiff, giving him the benefit of all reasonable inferences from the evidence.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  A motion for judgment as a matter of law should be denied if "reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions," but should be granted if "the facts and inferences point overwhelmingly in favor of [the moving party], such that reasonable people could not arrive at a contrary verdict."  Id., quoting Walker v. NationsBank of Florida, N.A., 53 F.3d 1548, 1555 (11th Cir. 1995), and Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997).  A mere "scintilla" of evidence, however, is not enough to create a genuine issue of material fact; the evidence must be substantial.  Walker v. NationsBank of Florida, N.A., 53 F.3d 1548, 1555 (11th Cir. 1995).

Facts Viewed Favorably to Plaintiff

Applying these standards to the evidence presented at trial, and drawing all reasonable inferences in favor of the plaintiff, the following facts are revealed.  For several days prior to October 22, 2004, plaintiff Brian Lacy, at that time still a minor less than 19 years of age, exhibited anxiety and odd behavior.  At the time, he was enrolled in high school and living with his mother and step-father at 637 Turrentine Street, Gadsden, Alabama.  On October 22, Brian did not feel well and stayed home from school.  During the day, he left home briefly to visit friends, but when he returned home around 4:00 p.m., he was agitated and incoherent.  His speech "rambled about incomprehensible subjects."[2]  Brian began to run a fever.  He tried to lie down, but was too agitated to remain still very long.  When his mother arrived home from work at 5:15 p.m., Brian was crying uncontrollably and "speaking nonsense."  Brian paced the floor and began speaking of demons.  He denied that his mother Gail was his true mother.

After spending several hours attempting to calm Brian, his mother and step-father decided that he should go to the hospital, but Brian refused.  His mother testified that he would "plant his feet" to resist being guided out of the house and into a car, although he did not appear to understand what his parents were trying to do.  During the entire time, Brian was speaking and moaning loudly and unintelligibly about gods and demons, and occasionally he would jump up and down so hard that his parents were afraid he would damage the house

Becoming exhausted with their efforts to deal with Brian and persuade him to go to hospital, his mother and step-father decided to summon help.  Not having a telephone in their home, Brian's

---

[2]  All of the quotations are taken directly from plaintiff's statement of facts in his brief in opposition to the renewed Rule 50 motion.

step-father walked about a block away to use the telephone at his parent's home.  There, Brian's step-father, Alan Driskell, called 911 and reported to the operator that he need an ambulance to take his stepson to the hospital.  During the conversation, Driskell may have mentioned that he was unsure what was wrong with Brian and that he might be having a reaction to drugs.[3]  Driskell repeatedly requested an ambulance, and the operator said "help" was on the way.

The 911 operator immediately dispatched help in the form of police, reporting to them that the call was a possible domestic violence involving drugs.  Officer Heard was the first officer to arrive at Turrentine Street.  He was met at the curb by Driskell, who was waiting to guide help into the house.  As Officer Heard got out of his car and approached Driskell, he saw a woman and man standing in or near the doorway of the home.  The man was in the doorway, trying to get out onto the front porch, but he was being blocked by the woman who was standing in front of him with her hands on his chest, as if trying to push him back into the house.[4]  Officer Heard rushed past Driskell and onto the porch.  As he approached, he verbally commanded Brian to "get on the ground" or "get on the floor."  Brian was unresponsive, continuing to shout and moan loudly about demons and gods and that Mrs. Driskell was not his mother; he continued to try to push around his mother to get out through the doorway.

Officer Heard again commanded Brian to "get on the floor," but when he did not respond, Officer Heard drew his collapsible metal baton and struck Brian on the left arm and thigh.  Officer

---

[3] Mr. Driskell testified at trial that he was unsure whether he mentioned these things, but that it was possible.  The 911 operator testified that Driskell said his son was having a drug reaction.

[4] Mrs. Driskell testified at trial that she had her hands on Brian and was blocking the doorway, trying to prevent him from going out the door and leaving the house until help arrived.  Officer Heard testified that he thought he saw the man push or strike the woman, but Mrs. Driskell denied that Brian ever raised his hands from his sides.

Heard did not have pepper spray or chemical spray with him, and his training indicated that he should not attempt to wrestle with Brian because he did not know if he was armed. Officer Heard struck Brian several more time with the metal baton. All of the strikes were directed to the arm or leg, and only one blow inadvertently landed on Brian's back when he moved. Brian's mother was shouting for Officer Heard not to strike Brian and that he needed help. In response to these blows, Brian began to retreat backward into the living room of the home, still facing Officer Heard and yelling and groaning unintelligibly about demons, God, and Jesus. After several more blows to the arm or leg, Officer Heard was able to back Brian into the kitchen of the house. It is unknown how many times Officer Heard struck Brian, but photographs of Brian's injuries suggest approximately ten blows.

When Officer Heard backed Brian into the kitchen, Officer Hammands arrived on the scene for the first time. Officer Heard instructed Hammands to use his chemical spray, which he did, spraying Brian in the eyes. As Brian was temporarily blinded, the officers rushed him and wrestled him to the floor, where he was restrained and handcuffed. Brian continued to wail and shout "in an other-worldly voice." Officers and paramedics then carried Brian out of the house.

Initially, Officer Heard insisted that Brian would be taken to jail as Brian's parents pleaded with him that Brian be taken to the hospital. Eventually a police supervisor instructed Officer Heard to transport Brian to the hospital where he was diagnosed with a complete schizophrenic breakdown. Urine and blood tests gave no indication that Brian had ingested any illegal drugs. Brian spent several weeks hospitalized for his mental illness, where he was also treated for cuts and bruises caused by the blows administered by Officer Heard. There is no suggestion that Brian's mental illness was caused or exacerbated by his confrontation with police.

6

<u>Fourth Amendment Excessive Force</u>

The question presented here is whether the degree of force used to effect the seizure[5] of the plaintiff was excessive.  Defendant contends that, in his individual capacity, he is entitled to qualified immunity.  Further, with respect to plaintiff's claim against him in his official capacity, the City of Gadsden, through Officer Heard, contends that plaintiff has not shown that any actions taken by him were the result of any policy, custom, or practice of the City.

I.  <u>Personal Capacity Liability</u>

Following <u>Saucier v. Katz</u>, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), the court is required to engage in a two-step analysis of the defendant's claim of qualified immunity. First, the court must determine whether the evidence, viewed favorably to the non-moving party,

---

[5] Although not raised as an issue by the plaintiff post-trial, the court re-affirms its conclusion that the fact of the seizure (as distinct from the degree of force used to effect the seizure) was reasonable under the Fourth Amendment.  Even though there was little or no probable cause that Brian was committing or about to commit a crime, there was probable cause to believe that he was mentally ill and a danger to himself or others.  The Fourth Amendment is not offended by the seizure of a person when officers have probable cause to believe that the person is mentally ill and in need of emergency medical evaluation to prevent self-harm or harm to others.  <u>See, e.g.,</u> <u>Pino v. Higgs</u>, 75 F.3d 1461, 1467 (10th Cir. 1996); <u>Maag v. Wessler</u>, 960 F.2d 773 (9th Cir. 1991); <u>Buchanan v. Maine</u>, 469 F.3d 158 (1st Cir. 2006); <u>Fisher v. Harden</u>, 398 F.3d 837 (6th Cir. 2005) and cases cited therein.  The need for Brian to be taken into some kind of custody was clear from his apparent mental illness and aggressive agitation (e.g. yelling, jumping, pacing, and stomping), particularly after his own parents summoned help for the very purpose of having him transported, forcibly if necessary, to a hospital.  Officer Heard observed Brian's mother attempting to restrain him physically and prevent him from leaving the house.  All agree that there was a physical (although not yet violent) confrontation and that Brian was completely unresponsive.  These observations by Officer Heard led him to believe that there was probable cause to arrest or seize Brian.  In any event, Officer Heard had "arguable" probable cause to believe that he was faced with domestic violence or a dangerously disturbed individual, warranting taking Brian into custody.  As such, at the very least, Officer Heard is entitled to qualified immunity with respect to the Fourth Amendment propriety of the need to seize Brian.

establishes a constitutional violation, then, second, whether the law was so clearly established on the date of these events, that "a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002). Turning to the first step, the Fourth Amendment protects citizens from "unreasonable" seizures, which includes prohibiting the use of unreasonable force in effecting a lawful and legitimate seizure. Graham v. Connor, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989); Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002) ("The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."). The court of appeals has explained its Fourth Amendment excessive force principles as follows:

> The Supreme Court has instructed that "all claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). It is well established that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 396, 109 S. Ct. 1865. To determine whether the force used is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake. See id.; Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985); Crosby v. Paulk, 187 F.3d 1339, 1351 (11th Cir. 1999). Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979), "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S. Ct. 1865.
>
> Therefore, "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993)

8

(quoting Graham, 490 U.S. at 396, 109 S. Ct. 1865). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97, 109 S.Ct. 1865. The reasonableness inquiry is also an objective one. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397, 109 S. Ct. 1865. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Id. at 397, 109 S. Ct. 1865; see Scott v. United States, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978). Furthermore, this Court has concluded that "Fourth Amendment jurisprudence has staked no bright line for identifying force as excessive," that "[t]he hazy border between permissible and forbidden force is marked by a multifactored, case-by-case balancing test," and "[t]he test requires weighing of all the circumstances." Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997).

Jackson v. Sauls, 206 F.3d 1156, 1169-70 (11th Cir. 2000); see also Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1168 (11th Cir. 2005). When applying this standard to a motion for judgment as a matter of law, the defendant "must show that Plaintiff failed to produce substantial evidence such that a reasonable jury could find that the amount of force used to arrest Plaintiff was unreasonable and thus a violation of the Fourth Amendment's prohibition on the use of excessive force by law enforcement officers." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000).

Although the court has recited the evidence in a light most favorable to the non-moving plaintiff, the legal "reasonableness" of the force used must be viewed from the perspective of the officer on the scene. Id.; Jackson v. Sauls, 206 F.3d 1156, 1169-70 (11th Cir. 2000); Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1168 (11th Cir. 2005). The test is the "objective reasonableness" of the force used by the officer, regardless of his subjective motive or animus, taking into account the often split-second nature of the decisions officers must make about the use of force.

9

The assessment of "reasonableness" entails careful consideration of a number of factors.   For example:

> The Supreme Court has established that, in order to balance the necessity of using some force attendant to an arrest against the arrestee's constitutional rights, a court must evaluate a number of factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id., 109 S.Ct. at 1872.  See also, e.g., Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986) (holding that, in determining if force was reasonable, courts must examine (1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted).  Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.

Lee v. Ferraro, 284 F.3d 1188, 1197-98 (11th Cir. 2002).

Applying these standards to the evidence offered at trial, the court finds as a matter of law that the force used by Officer Heard was reasonable under the circumstances.  Several factors inform the court's finding on this point.  First, whether accurate or not, Officer Heard had been advised by the 911 operator that dispatched him to the scene that it involved a case of domestic violence with possible drug use.  Thus, even before arriving on the scene, Officer Heard had been led to believe that he was entering a potentially violent situation.  When he arrived, he immediately noticed a woman on the porch standing face-to-face with a man in the doorway.  The woman had her hands on the man, plainly attempting to restrain him or block his exit from the house.[6]  Thus, again, Officer Heard came into what appeared to him to be a physical confrontation.

---

[6] Officer Heard testified that he saw the man push the woman, but the court does not take this testimony into consideration because the plaintiff's evidence, consisting of his mother's testimony, disputed that Brian ever pushed his mother.  It is undisputed — indeed, admitted by Brian's mother — that she was attempting to push him back into the house.

As Officer Heard approached the porch, his first instinct based on his training was to separate the man and woman, and he did so by attempting to insert himself between them.  He ordered the man — Brian — to "get on the floor" or "get on the ground," but due to his mental illness, Brian was completely unresponsive.  Officer Heard gave a second verbal command, to which Brian did not respond, and then Officer Heard drew his metal baton and struck Brian once on the left arm.  It must be understood that Officer Heard was, at this point, alone and armed only with his sidearm and the baton.  He was not carrying chemical or pepper spray.  His training taught him that, under such circumstances, he should not attempt to physically wrestle the person to the ground because he had no assistance and he did not know whether Brian was armed.  Thus, at that moment, Officer Heard's only option was to use the baton.  He could not retreat from the confrontation between Brian and his mother because it was his duty to separate them to prevent potential violence.  Brian was utterly unresponsive to his verbal commands.  He could not attempt to subdue Brian physically without another officer's assistance.  He lacked any chemical or pepper spray so that, aside from the baton, the only other force available to him was his sidearm.  Under the circumstances, Officer Heard's decision to control Brian by forcing him back into the house by use of the baton until other officers arrived was not objectively unreasonable.  There was a need for the application of force to separate Brian and his mother and to control Brian until help arrived.  He limited his use of force to the least harmful that was effective.  The injuries inflicted upon Brian were relatively minor cuts and bruises. Officer Heard did not use unreasonable force in attempting to control Brian as part of his seizure of him, and thus, there was no violation of Brian's rights under the Fourth Amendment.

Even if the use of the baton — or the number of blows struck — could be considered unreasonable, Officer Heard individually remains entitled to qualified immunity unless the degree

of force was so great that no reasonable officer could have considered it appropriate.  See Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002).  As explained, a reasonable officer could have considered the use of the baton to control and restrain Brian to be reasonable in the circumstances. At one point in the confrontation did Brian cease resisting Officer Heard.  Although he retreated backward into the house, he never — due obviously to his mental illness — relented and either got on the floor to be handcuffed or otherwise indicated to Officer Heard that he surrendered.  Indeed, it was not until Officer Hammands arrived, sprayed Brian with pepper spray, and the two officers together wrestled Brian to the floor that the perceived risk Brian posed ended.  It cannot be said, therefore, that Officer Heard's use of one or two blows was reasonable, but not those thereafter, because at no point did Brian cease to be perceived as a threat to Officer Heard until he was fully restrained.  Thus, Officer Heard, in his individual capacity, is entitled to qualified immunity with respect to plaintiff's Fourth Amendment excessive force claim.

####    II.  Official Capacity Liability

Likewise, for the reasons already explained above, Officer Heard is not liable to plaintiff on this claim in his official capacity as well.  There was no unreasonable use of force by Officer Heard; consequently, neither he nor his employer, the City of Gadsden, is liable on such a claim.

As a further consideration, even if Officer Heard could be faulted, there is no evidence that his choice of the degree of force used was in any way the result or product of any policy, practice, or custom of the City of Gadsden.  The claim against Officer Heard in his official capacity is essentially a claim against his employer, the City of Gadsden.  See Will v. Michigan Department of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L .Ed. 2d 45 (1989) ("[A] suit against a

state official in his or her official capacity is not a suit against the official but rather is a suit against

the official's office ," and, "[a]s such, it is no different from a suit against the State itself."); Cooper

v. Dillon, 403 F.3d 1208, 1221 n. 8 (11th Cir. 2005); Simmons v. Conger, 86 F.3d 1080 (11th Cir.

1996).  Because Gadsden cannot be liable simply on the *respondeat superior* that it is Officer

Heard's employer, see Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct 2018, 56

L. Ed. 2d 611 (1978), plaintiff must show that some policy, practice, or custom of the City's was the

motivating force behind the alleged constitutional violation.  In Cooper v. Dillon, 403 F.3d 1208,

1221 (11th Cir. 2005), the court of appeals explained the potential basis for "official capacity"

liability, saying:

> When suing local officials in their official capacities under § 1983, the plaintiff has
> the burden to show that a deprivation of constitutional rights occurred as a result of
> an official government policy or custom.  See Little v. City of North Miami, 805 F.2d
> 962, 965 (11th Cir. 1986) (per curiam) (quoting Monell v. Dep't of Social Servs., 436
> U.S. 658, 690, 98 S. Ct. 2018, 2035-36, 56 L. Ed. 2d 611 (1978)).  "A policy is a
> decision that is officially adopted by the municipality, or created by an official of
> such rank that he or she could be said to be acting on behalf of the municipality.... A
> custom is a practice that is so settled and permanent that it takes on the force of law."
> Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997).  "Only those
> officials who have final policymaking authority may render the municipality liable
> under § 1983." Hill v. Clifton, 74 F.3d 1150, 1152 (11th Cir. 1996) (citing Pembaur
> v. City of Cincinnati, 475 U.S. 469, 481, 106 S. Ct. 1292, 1299, 89 L. Ed. 2d 452
> (1986) (plurality opinion)).  "[S]tate and local positive law" determine whether a
> particular official has final policymaker authority for § 1983 purposes.  See Jett v.
> Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S. Ct. 2702, 2724, 105 L. Ed. 2d 598
> (1989). "[M]unicipal liability may be imposed for a single decision by municipal
> policymakers under appropriate circumstances." Pembaur, 475 U.S. at 480, 106
> S. Ct. at 1298. [Internal footnotes omitted].

Thus, to be able to extend liability to Officer Heard's employer, the City of Gadsden, plaintiff must

be able to show that the degree of force used by Officer Heard was motivated by or the product of

some policy, practice, or custom of the City, and that he has simply failed to do.

At trial, plaintiff offered no evidence that the City has a policy, practice, or custom of approving *excessive* use of force to make arrests.  Indeed, the only evidence relating to the City's policies regarding the use of force was that offered by defendants, concerning the "hierarchy of force," under which there are ascending degrees of force that may be used.  These levels of force range from mere officer presence at a scene, up through verbal commands, the "open handed" or "closed handed" force of an officer putting his hands on someone, the intermediate force of using a baton or chemical spray, to the use of deadly force.  This "hierarchy of force" is recognized and used by police organizations nationwide.  But this policy does not authorize the use of *excessive* force, nor does it purport to dictate the exact degree of force an officer may or must use in any specified situation because the variety of circumstances under which force may be necessary is endless and cannot be distilled to simple rules.  The policy is intended to provide guidelines to minimize the use of unnecessary force, not to excuse or authorize excessive force.  Thus, there was no evidence offered at trial of a policy, practice, or custom on the part of the City of Gadsden authorizing or tacitly accepting excessive force.  Consequently, the neither Officer Heard in his official capacity nor the City can be liable on that claim.

<u>State Law Assault and Battery</u>

Plaintiff's final claim against Officer Heard is the allegation that Officer Heard illegally subjected him to assault and battery under Alabama state law.  Defendant contends that he is entitled to immunity under state law unless plaintiff is able to meet the higher standard of showing that Officer Heard acted maliciously, wilfully, or in bad faith.

Alabama Code § 6-5-338(a) provides, in pertinent part:

14

"(a) Every peace officer, ... whether appointed or employed as such peace officer by the state or a county or municipality thereof, ... shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."

In Thurmond v. City of Huntsville, 904 So. 2d 314 (Ala. Civ. App. 2004), the Alabama Court of

Civil Appeals stated rule of discretionary-function immunity this way:

Our supreme court has defined discretionary functions as "'those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances.'" Ex parte City of Gadsden, 781 So. 2d 936, 938 (Ala.2000) (quoting Wright v. Wynn, 682 So. 2d 1, 2 (Ala.1996)). "'[E]xercising judgment in the enforcement of the criminal laws of the State,' ... is a recognized discretionary function." Ex parte Tuscaloosa County, 796 So. 2d 1100, 1106 (Ala.2000) (quoting Ex parte Cranman, 792 So. 2d 392, 405 (Ala. 2000)). Our supreme court has also held that "acts taken in bad faith, or willful or malicious conduct, will not be considered discretionary in nature." Ex parte City of Montgomery, 758 So. 2d 565, 569 (Ala.1999) (citing Couch v. City of Sheffield, 708 So. 2d 144, 153 (Ala. 1998)); see Wright v. Wynn, *supra*; Barnes v. Dale, 530 So. 2d 770 (Ala. 1988); DeStafney v. University of Alabama, 413 So. 2d 391 (Ala. 1981).

 Thus, the first step in analyzing whether a police officer's conduct is protected by the doctrine of discretionary-function immunity under § 6-5-338(a) is to determine whether the police officer was performing a discretionary function. Ex parte City of Gadsden, 781 So. 2d at 938. Upon that showing, the burden shifts to the plaintiffs to present substantial evidence tending to show that the police officer's conduct was "so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith." Couch v. City of Sheffield, 708 So. 2d at 153; Wright v. Wynn, *supra*. See also Ex parte Tuscaloosa County, 796 So. 2d at 1106 (quoting Ex parte Cranman, 792 So. 2d at 402). Accord, Lee v. Minute Stop, Inc., 874 So. 2d 505 (Ala. 2003).

In any discretionary-function immunity case, courts must make a "pragmatic assessment of what, if any, degree of immunity is necessary to enable the particular governmental function to be effectively performed." Bell v. Chisom, 421 So.2d 1239, 1241 (Ala. 1982). With regard to police officers performing their law-enforcement duties, our supreme court has stated that discretionary-function immunity must exist because a police officer should not be required "to ponder and ruminate over decisions that should be made in a split second." White v. Birchfield, 582 So. 2d 1085, 1087 (Ala. 1991). Our supreme court has also stated that the grant

15

of discretionary-function immunity is justified by "'[t]he need to attract and keep capable [police] officers, the allocation of scarce resources for law enforcement, and the need for officers to make decisions based on the requirements of the circumstances rather than on their potential for personal liability.'" Nunnelee v. City of Decatur, 643 So. 2d 543, 546 (Ala. 1993) (quoting Thetford v. City of Clanton, 605 So. 2d 835, 843 (Ala. 1992)). In addition, it has been held that the shield of discretionary-function immunity is "'particularly applicable'" where "'[a police] officer is required to make difficult decisions on the spur of the moment'" while performing his law-enforcement duties, Nunnelee, 643 So.2d at 546 (quoting Thetford, 605 So. 2d at 843), and in situations where a police officer responds to a "life-threatening situation," Birchfield, 582 So.2d at 1087. More recently, it has been held that discretionary-function immunity applies when a police officer is required to make "difficult split-second decision[s] under unusual circumstances." Ex parte City of Gadsden, 781 So. 2d at 940. [Internal footnotes omitted].

Id. at 319-320.

Under the undisputed evidence in this case, the court has no difficulty concluding that Officer Heard was engaged in a discretionary function within the line and scope of his duties as a police officer. He was dispatched to a scene he had reason to believe involve a potential for violence, and he acted as a police officer to control and defuse the situation. The need to exercise force involved making a "difficult split-second decision under unusual circumstances." Upon reaching that step in the analysis, the burden of proof shifts to the plaintiff to show by substantial evidence that the defendant acted so egregiously "as to amount to willful or malicious conduct or conduct engaged in in bad faith." Plaintiff has failed to do so.

There is little or no evidence that Officer Heard acted with actual malice or bad faith. He did not know the plaintiff or his family, so he had no reason to harbor ill will toward them. He was faced with a potentially violent situation in which he used objectively reasonable force. As already discussed above, Officer Heard had no real alternative to using his baton to control the plaintiff until help arrived. There is no evidence that Officer Heard verbally expressed any hostility or malice

16

toward plaintiff.  All that plaintiff can point to as evidence of malice or bad faith is some inconclusive recordings from a dashboard video camera in which Officer Heard is heard shouting that plaintiff, after being restrained, was going to jail, not to the hospital.  But this evidence alone does not establish malice or bad faith.  Certainly, if Officer Heard believed he was dealing with a drug-related domestic violence call, jail would be a legitimate result of the arrest.  Only with hindsight — knowledge *no one* possessed that night — do we now know that Brian was suffering from mental illness and not a drug reaction.  Thus, merely because Officer Heard initially insisted that plaintiff go to jail does not establish that his use of force was malicious, wilful, or in bad faith.  Absent such evidence, he and the City of Gadsden are entitled to discretionary-function immunity under Alabama law.  Plaintiff's state-law claim for assault and battery is due to be dismissed.

## Conclusion

Based on the foregoing considerations, viewing the evidence most favorably for the plaintiff, the court finds that Officer Heard's renewed motion for judgment as a matter of law is due to be granted.  The evidence presented at trial simply failed to establish a claim on which a reasonable jury could return a verdict for plaintiff.

A separate order of dismissal will be entered.

DONE this 9th day of May, 2007.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

17